73 N.J. Super. 364 (1962)
180 A.2d 145
UNITED STATES RUBBER COMPANY, A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT,
v.
CHAMPS TIRES, INCORPORATED, A NEW JERSEY CORPORATION, JOSEPH F. CUCCIA AND JOSHUA KATZ, DEFENDANTS, AND ALBINO NIGRO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 26, 1962.
Decided April 2, 1962.
*366 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Ralph W. Chandless argued the cause for appellant (Messrs. Chandless, Weller & Kramer, attorneys).
Mr. Roger C. Ward argued the cause for respondent (Messrs. Pitney, Hardin & Kipp, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff brought an action in the Law Division seeking recovery from defendant company, Champs Tires, Inc., for tires sold and delivered to it (counts 1 and 2), and judgment against the individual defendants Nigro, Katz and Cuccia, jointly and severally, on their guarantee of the company's account with plaintiff (count 4). The trial court directed judgment for $32,922.57 plus interest ($3,410.86) against the corporate defendant. It submitted the case to the jury on the guarantee count against the individual defendants, and judgment was entered in the total sum of $36,333.43 on the verdict in favor of plaintiff. The third count of the complaint against all defendants, sounding in conversion, was dismissed by the trial court on motion, and plaintiff does not appeal this dismissal.
Although Nigro appeals the whole of the final judgment, he was not a party to nor found liable under counts 1 and 2 of the complaint, nor does his brief deal with the corporate defendant's liability. This appeal is limited solely to Nigro's liability as adjudicated under the guarantee count.
Plaintiff deals in tires through its Gillette Division, and defendant Champs Tires, Inc., was a retail tire dealer. On August 1, 1958 they entered into a consignment contract. *367 Although Nigro contends that the contract expired December 31, 1958, we find that this is not so. By its very terms and by reason of the business transacted between the parties, the consignment contract was in effect during 1959, the year in which the debts in issue arose. In fact, the individual defendants admitted, in their answers to interrogatories, that the contract was in full force and effect during 1959. In addition to tires delivered to the corporate defendant under the consignment agreement, plaintiff during 1959 sold it tires on an outright or "straight sale" basis. By virtue of consignments and sales, the corporate defendant became indebted to plaintiff for $32,922.57, the amount of the debt for which judgment was directed against it.
On January 6, 1958, more than six months before the execution of the above consignment contract and several days before the execution of what appears to have been a predecessor consignment contract, defendants Nigro, Katz and Cuccia executed a guarantee in favor of plaintiff. Nigro was then president and a substantial stockholder of the corporate defendant. He and his individual codefendants admit the execution of the guarantee, which reads:
"In consideration of the credit which UNITED STATES RUBBER COMPANY (New York Branch), hereinafter called the Company, has extended and may extend to CHAMPS TIRES INCORPORATED, #10 Route 46, Lodi, N.J. hereinafter called the dealer, [ILLIGIBLE WORD] (we, jointly and severally) hereby guarantee to said Company the payment of any and all amounts which said Dealer may now be owing said Company, and any and all amounts said Dealer may hereinafter owe or become indebted to said Company, on account of the purchase price of any goods sold by said Company to the Dealer and/or on account of any obligations arising under the terms or operation of any consignment agreement between the Company and said dealer and/or by reason of any business transactions whatever between the Company and said Dealer, upon such prices, terms, conditions and credits as may be agreed upon between the Company and said Dealer from time to time without notice to the undersigned.
The liability of the undersigned under this guaranty shall not be released by any extension of credit or time of payment accorded by *368 the Company to the dealer or by the acceptance of notes therefore or by any composition or agreement as to the amount of terms of [or?] manner of indebtedness or otherwise.
I (we) hereby waive notice of the acceptance of this guaranty, of shipment, of any goods or creation of any said indebtedness, of maturity of same, demand for payment and notice of extension of maturity or of any default, and it shall not be necessary for the Company to take proceedings against the Dealer before applying to me (us) and charging me (us) for payment of any sum, the payment of which is hereby guaranteed.
 The amount guaranteed is limited to $ NOT LIMITED.
This is an absolute, unconditional and continuing guaranty up to and including the amount above stated owing at any one time, regardless of the amounts owing and paid by the Dealer previously thereto.
In case any transactions of the character above indicated are had by the Dealer with any subsidiary or affiliated corporation or corporations of United States Rubber Co. it shall be understood that this guaranty is effective, according to its tenor, in favor of the said corporation, or corporations, with respect to any obligations thereby created.
This guaranty shall bind the undersigned and his (their) representatives, executors and administrators." (Italics ours)
It is quite apparent from the record that defendant company did not do well in 1959. Its collections from customers were not proceeding satisfactorily, and for that reason, among others, its account with plaintiff was falling into arrears. On September 25, 1959 defendant Nigro, as president, executed two assignments of accounts receivable on behalf of defendant company. One of these covered accounts arising from the company's sales of merchandise not manufactured by plaintiff, aggregating $7,895.84, and the other sales of merchandise manufactured by plaintiff (Gillette Division), aggregating $25,355.41, or a total of $33,251.25. It is clear that the assignments were to secure defendant company's debt to plaintiff, the final paragraph of each instrument reading:
"This assignment shall not release the undersigned Assignor from any liability or guarantee under the terms of any agreement or other instrument or otherwise heretofore given by the Assignor to the Assignee. All sums actually received by the Assignee in respect to any or all of the accounts hereby assigned shall be credited against *369 the liability of the Assignor to the Assignee after deduction of any and all costs and expenses of collection."
The consignment contract itself provided for preserving plaintiff's interest and claim to the corporate defendant's accounts receivable arising from sales of consigned merchandise. That contract read, in pertinent part:
"* * * title to such of said goods as at any given time shall not have been sold by the Consignee, and to the accounts receivable or the proceeds, as the case may be, from the sales of the remainder of such goods, shall always be vested in the Consignor, and such goods, accounts receivable and proceeds shall be at all times subject and and [sic] under the direction and control of the Consignor * * *" (par. 3(c))
"The Consignee guarantees payment of all bills and accounts for goods sold by him under this agreement * * *. [Upon payment by Consignee] title to such goods or the accounts receivable theretofore or the proceeds thereof so paid for shall pass to the Consignee * * *." (par. 3(d))
"The Consignee shall execute any and all other documents which the Consignor may deem necessary or proper to carry out the purposes of this agreement." (par. 3(f))
At the time of executing the assignments defendant, as president, also executed a form letter which plaintiff might use in notifying account debtors of the assignment.
After receiving the assignments plaintiff proceeded to enforce them. Notice of the assignment of each account receivable was sent to the debtor involved. Plaintiff pursued its usual dunning procedures, including phone calls and visits. A number of the accounts were put in the hands of plaintiff's attorneys, who reported that some of them were uncollectible. Where accounts were disputed plaintiff would attempt to get information from the corporate defendant. Plaintiff managed to collect $12,118.41 in all, or over one-third of the $33,251.25 accounts assigned. Defendant company was credited with the amount collected. The balance of $21,132.84 was regarded as uncollectible. In connection with plaintiff's attempts to collect, it may be noted that of the 117 non-Gillette accounts, averaging *370 $67.49, only 23 exceeded $100. Of the 149 accounts representing Gillette merchandise sold by defendant company, the average face amount was $170.17, only 44 exceeding $100. Incidentally, we observe that at no time during the trial, nor presently, have defendants suggested that the accounts were in fact worth their face value, nor did they attempt to prove their actual value.
The trial court specifically charged the jury that it was to determine whether plaintiff had exercised "that degree of diligence which a reasonably prudent business man would have exercised under the circumstances in the collection of the accounts receivable." Defendant company's difficulty in collecting the accounts prior to the assignments was a fact to be taken into consideration in determining whether plaintiff had exercised due diligence. The judge pointed out that plaintiff had sought to establish that the usual dunning procedures had been followed. It was for defendants, he said, to satisfy the jury by the greater weight of the credible evidence that plaintiff had failed to exercise due diligence in attempting to collect the accounts. If there was such a failure, the jury was to determine whether it resulted in a diminution in the value of the security of the accounts receivable.
Since the trial judge found that the corporate defendant's liability for $32,922.57, and the uncollected face amount of the assigned accounts of $21,132.84 were uncontroverted, he charged the jury that the only question to be resolved was whether plaintiff used reasonable diligence in collecting the accounts receivable. The jury resolved the question in plaintiff's favor. It is inferable that it did so because defendants failed to adduce any proof that plaintiff did less than it reasonably should have in realizing upon the accounts assigned to it.
In attacking the judgment, defendant Nigro contends that the guarantee was not an absolute one, but that "collection of the accounts receivable was a condition precedent" to plaintiff's cause of action on the guarantee. In *371 other words, the guarantee was a guarantee of collection or an indemnity against loss. But a reading of the guarantee shows that defendant, like Katz and Cuccia, was in fact an absolute guarantor of payment. The undertaking was "absolute, unconditional and continuing," unaffected by "any composition or agreement as to the amount or terms [or] manner of payment." The individual guarantors waived any duty on plaintiff's part to proceed against the principal debtor before enforcing the guarantee. The clarity of the language of the guarantee is unmistakable. Pfeiffer v. Crossley, 91 N.J.L. 433 (Sup. Ct. 1918), affirmed on opinion 92 N.J.L. 638, 639 (E. & A. 1920); Superior Finance Corp. v. John A. McCrane Motors, Inc., 116 N.J.L. 435, 436-7 (E. & A. 1936); and Stearns, Law of Suretyship (5th ed., Elder, 1951), § 4.2, p. 60.
The cases on which defendant Nigro relies have no application. Boorstein v. Miller, 124 N.J. Eq. 526 (Ch. 1938), involved a contract of indemnity against "any deficiency or loss." In that case the vice-chancellor quoted from Westville Land Co. v. Handle, 112 N.J.L. 447 (Sup. Ct. 1934), where Justice Heher pointed up the essential difference between a covenant of indemnity and a guarantee of payment of the kind here involved. Greenberg v. Leff, 104 N.J. Eq. 502 (Ch. 1929), was a conventional action to set aside a fraudulent conveyance, brought by an accommodation endorser. Delaware, L. & W.R.R. Co. v. Oxford Iron Co., 38 N.J. Eq. 151 (Ch. 1884), and Nutz v. Murray-Nutz, Inc., 109 N.J. Eq. 95 (E. & A. 1931), involved the relationship between a principal and surety and are not authority for defendants' position.
Defendant Nigro argues that he was prejudiced by the assignment and noncollection of the accounts receivable. The taking of additional security, such as assignment of accounts receivable, by a person in whose favor the guarantee operates, does not release the guarantor, for it in no way changes his contract and is not to his injury. Cabrera *372 v. American Colonial Bank, 214 U.S. 224, 29 S.Ct. 623, 53 L.Ed. 974 (1909); see also 24 Am. Jur., Guaranty, § 83, p. 929 (1939); 38 C.J.S. Guaranty § 80, p. 1249 (1943); Stearns, op. cit., § 6.52, pp. 195-6.
Defendant's position certainly was not adversely affected by the assignment of the accounts receivable which arose from sales by the corporate defendant of consigned merchandise, for these accounts were already and in any event subject to plaintiff's claim, as will be seen from a reading of those parts of paragraph 3 of the consignment contract reproduced earlier in our opinion. The assignment was merely the confirmation or further assurance of an existing status. That status was part of the very contractual relationship which defendant's own guarantee contemplated, as evidenced by a reading of the guarantee. He had consented in advance to this method of treating the Gillette accounts. The corporate defendant had itself guaranteed those accounts  see paragraph 3(d) of the consignment agreement quoted above. Plaintiff is correct when it states that under any view of the guarantee, Nigro is liable for the amount of the deficiency of this category of accounts receivable, rather than entitled to credit therefor.
The assignment of the nonconsignment accounts was a fresh security for the guaranteed debt and actually improved Nigro's position as guarantor. As was recognized in the Cabrera case, above, this did not in any way change the guarantee contract.
Since Nigro himself was the person who executed the assignments on behalf of his company, he had direct notice of the assignments. He cannot be allowed to repudiate on the alleged ground that they prejudiced him as guarantor  a claim which we find legally without substance.
As we have already observed, the jury, after being carefully instructed by the court, found that plaintiff used reasonable and sufficient methods of collection. Plaintiff adduced testimony to show just what it had done to collect the assigned accounts. Defendants failed to counter this *373 testimony; they did not go forward with the evidence in an attempt to establish that plaintiff could have done something more to realize a greater sum. See Schumann v. Fidelity Union Trust Co., 127 N.J. Eq. 249, 253 (E. & A. 1940); 38 C.J.S. Guaranty § 99, pp. 1277-1278 (1943). They offered no proof as to how much they deteriorated in value while in plaintiff's hands, and whether any alleged deterioration in value was due to plaintiff's treatment of them. The jury could reasonably have found that plaintiff realized everything it could when it collected over $11,000 on the accounts.
Plaintiff having established the amount of defendant company's debt after giving it credit for all accounts receivable collected, returns of goods, adjustments, etc., and having proved that nothing had been paid on that debt, it is entitled to collect under the guarantee.
The judgment is affirmed.